James E. Robertson et al., appellants, v.
Jacobs Cattle Company, a partnership,
et al., appellees.

___ N.W.2d ___

Filed December 4, 2015.   No. S-15-026.

1. **Partnerships: Accounting: Appeal and Error.** An action for a partnership dissolution and accounting between partners is one in equity and is reviewed de novo on the record.
2. **Equity: Appeal and Error.** On appeal from an equity action, an appellate court resolves questions of law and fact independently of the trial court's determinations.
3. **Courts: Judgments.** The proper place to pay a judgment is the clerk of the court in which the judgment is obtained.
4. **Courts: Appeal and Error.** Where the Nebraska Supreme Court reverses a judgment and remands a cause to the district court for a special purpose, on remand, the district court has no power or jurisdiction to do anything except to proceed in accordance with the mandate as interpreted in the light of the Supreme Court's opinion.

Appeal from the District Court for Valley County: Karin L. Noakes, Judge. Affirmed.

Patrick J. Nelson, of Law Office of Patrick J. Nelson, L.L.C., for appellants.

David A. Domina and Megan N. Mikolajczyk, of Domina Law Group, P.C., L.L.O., and Gregory G. Jensen for appellees.

Heavican, C.J., Connolly, McCormack, Miller-Lerman, Cassel, and Stacy, JJ.

Cassel, J.

## INTRODUCTION

For the third time, we consider an appeal from a judicial dissociation of four partners from a family agricultural partnership having assets consisting primarily of real estate. The main issue is whether the district court, in recalculating the buyout distributions, correctly implemented our mandate from the second appeal. The dissociating partners rely on a hypothetical capital gain on the real estate but ignore that this "gain" exceeds the total profit on the hypothetical sale of all of the partnership's assets. We affirm the district court's judgment.

## BACKGROUND

In *Robertson v. Jacobs Cattle Co.* (*Robertson I*),[1] we upheld the judicial dissociation of four partners of the Jacobs Cattle Company, a family partnership owning agricultural land in Valley County, Nebraska. However, we reversed the district court's calculation of the buyout price to be paid to the four dissociating partners and remanded the cause for further proceedings on that issue.

In the second appeal (*Robertson II*),[2] we again reversed the district court's calculation of the buyout price to be paid to the dissociating partners. We remanded the cause with direction that the court calculate the buyout distributions "by adding 12.5 percent of the profit received from a hypothetical sale of the partnership's assets . . . to the value of each dissociated partner's capital account."[3] The district court purported to follow our mandate, but the dissociating partners filed this appeal from its order.

The underlying facts concerning this appeal are primarily contained in *Robertson I* and will be briefly summarized here.

---

[1] *Robertson v. Jacobs Cattle Co.*, 285 Neb. 859, 830 N.W.2d 191 (2013).

[2] *Robertson v. Jacobs Cattle Co.*, 288 Neb. 846, 852 N.W.2d 325 (2014).

[3] *Id.* at 853, 852 N.W.2d at 331.

The Jacobs Cattle Company was organized in 1979. As noted above, the partnership consisted of agricultural land, comprising 1,525 acres. As of September 2011, the land was appraised at a value of $5,135,000.

At the time of litigation, the partnership consisted of seven partners. (Our opinion in *Robertson I* stated that the partnership had six partners. But as indicated in *Robertson II*, one individual represented two trusts, and thus, the partnership had seven partners.) The partners included:

• Ardith Jacobs, as trustee of the Leonard Jacobs Family Trust;
• Ardith Jacobs, as trustee of the Ardith Jacobs Living Revocable Trust;
• Dennis Jacobs;
• Duane Jacobs;
• Carolyn Sue Jacobs;
• James E. Robertson; and
• Patricia Robertson.

In July 2007, Duane, Carolyn, James, and Patricia (collectively the dissociating partners) filed a complaint against the partnership, Ardith, and Dennis (collectively the remaining partners). The complaint sought a dissolution and winding up of the partnership under the Uniform Partnership Act of 1998. In an amended answer and counterclaim, the remaining partners alleged that dissociation, not dissolution, was the appropriate remedy.

After a bench trial, the district court determined that no grounds for dissolution of the partnership had been established under Neb. Rev. Stat. § 67-439(5) (Reissue 2009). However, the court ordered dissociation of the four partners by judicial expulsion pursuant to Neb. Rev. Stat. § 67-431(5)(a) and (c) (Reissue 2009). And after receiving buyout proposals from the parties, the court arrived at a distribution scheme wherein each of the dissociating partners received 5.33 percent of the total liquidation value of the partnership.

In *Robertson I*, we affirmed the dissociation of the four partners and the date of the judicial expulsion as the valuation

date of the partnership's assets. We also observed that the buyout price was governed by Neb. Rev. Stat. § 67-434(2) (Reissue 2009), which provides:

> The buyout price of a dissociated partner's interest is the amount that would have been distributable to the dissociating partner under subsection (2) of section 67-445 if, on the date of dissociation, the assets of the partnership were sold at a price equal to the greater of the liquidation value or the value based on a sale of the entire business as a going concern without the dissociated partner and the partnership were wound up as of that date. Interest must be paid from the date of dissociation to the date of payment.

And another statute requires that profits and losses be credited and charged to the partners' accounts. Neb. Rev. Stat. § 67-445(2) (Reissue 2009) provides:

> Each partner is entitled to a settlement of all partnership accounts upon winding up the partnership business. In settling accounts among the partners, profits and losses that result from the liquidation of the partnership assets must be credited and charged to the partners' accounts. The partnership shall make a distribution to a partner in an amount equal to any excess of the credits over the charges in the partner's account. A partner shall contribute to the partnership an amount equal to any excess of the charges over the credits in the partner's account but excluding from the calculation charges attributable to an obligation for which the partner is not personally liable under section 67-418.

We concluded that based upon the plain language of § 67-434(2), "the proper calculation must be based upon the assumption that the partnership assets, here the land, were sold on the date of dissociation, even though no actual sale occurs."[4]

---

[4] *Robertson I, supra* note 1, 285 Neb. at 877, 830 N.W.2d at 205.

And as to the appreciation in the land's value, we determined that the capital gain from a hypothetical sale of the land was to be considered "profit" in the context of § 67-445(2). However, there was no indication as to whether such profit should have been distributed based upon the partners' capital account ownership or their right to partnership income.

Under the operative partnership agreement, each partner was allotted a capital account and an income account. A partner's capital account was "directly proportionate to the original Capital contributions as later adjusted for draws taken from the Partnership." As for the income account, the partnership's "net profits and net losses . . . as determined by generally accepted accounting principles" were to be credited or debited to each partner's income account in proportion to the partner's votes in the partnership. Out of a total of eight votes in the partnership, the dissociating partners each possessed one vote. Thus, each of the dissociating partners was entitled to 12.5 percent of the partnership's "net profits."

In determining its initial buyout price, the district court considered the value of the partnership's assets, including the appreciated value of the land, less the partnership's liabilities, and arrived at a liquidation value of $5,212,015 for the partnership. The court then applied each partner's capital account ownership percentage to the partnership's total liquidation value. Thus, because each dissociating partner possessed 5.33 percent capital account ownership, each dissociating partner received 5.33 percent of the total liquidation value.

We reversed the district court's buyout price and remanded the cause for further proceedings concerning the treatment of the appreciation in the value of the land. In *Robertson I*, it was unclear whether the capital gain which would be realized from a hypothetical sale of the land should be distributed based upon the partners' capital account ownership or as "net profits" of the partnership. As the district court determined, if the capital gain was distributable based upon capital account

ownership, each of the dissociating partners was entitled to
5.33 percent. But if the capital gain was to be treated as "net
profits," each of the dissociating partners was entitled to
12.5 percent.

On remand, the district court received expert testimony
from both the dissociating partners and the remaining part-
ners. Ultimately, the court determined that the capital gain
from a hypothetical sale of the land did not constitute "net
profits." Rather, the court determined that the capital gain
should be distributed in accordance with the partners' capital
account ownership. This resulted in a lower buyout distribu-
tion to the dissociating partners, and the dissociating part-
ners appealed.

In *Robertson II*, we concluded that the district court erred
in determining that the capital gain from a hypothetical sale of
the land would not constitute "net profits." In making its deter-
mination, the court had relied upon expert testimony that gain
or income could not be recognized until an actual sale of the
land took place. But this testimony was based upon the prem-
ise that no actual sale occurred. And we determined that this
premise was inconsistent with the controlling statute. As we
explained, "Appellees' experts' analysis ignored the statutory
requirement that the buyout distributions be calculated based
on the assumption that the assets had been sold and the result-
ing profits distributed to the partners."[5]

However, we determined that there was sufficient evidence
for the district court to calculate the buyout distributions on
remand. The dissociating partners' expert witness testified
that under generally accepted accounting principles, the term
"net profits" includes capital gain from the sale of land. Thus,
we concluded that the "capital gain from the hypothetical
sale of land should be distributed to the partners in accord-
ance with [the provision] governing the distribution of 'net

---

[5] *Robertson II, supra* note 2, 288 Neb. at 852, 852 N.W.2d at 330.

profits.'"[6] And we remanded the cause with direction that the district court "enter an order which calculates a buyout distribution by adding 12.5 percent of the profit received from a hypothetical sale of the partnership's assets . . . to the value of each dissociated partner's capital account."[7]

On remand, the dissociating partners offered seven exhibits for the district court's consideration: this court's opinion and mandate, a certified copy of the application to spread mandate and determine judgment amount filed with the district court, affidavits and e-mails pertaining to attempts by the dissociating partners' counsel to obtain a bill of exceptions for the evidentiary hearing following our mandate in *Robertson I*, and the bill of exceptions for that hearing. The remaining partners objected, essentially based on this court's determination that there was sufficient evidence already in the record for the district court to calculate the buyout distributions on remand. The district court sustained the objections.

The district court purported to follow our mandate in *Robertson II*. To that effect, it again identified the net liquidation value of the partnership as $5,212,015. From that amount, it subtracted the total balance of the partners' capital accounts to arrive at a gain of $4,052,201 from the liquidation:

| | |
|---|---|
| Net liquidation value | $5,212,015 |
| Total balance of capital accounts | ($1,159,814) |
| Gain on liquidation of partnership | $4,052,201 |

The court then distributed 12.5 percent of the gain to each of the dissociating partners, in addition to the balance of the dissociating partners' capital accounts. Thus, the dissociating partners received:

- Duane     $598,497 = ($4,052,201 × .125) + $91,972
- Carolyn     $598,501 = ($4,052,201 × .125) + $91,976
- James     $598,977 = ($4,052,201 × .125) + $92,452
- Patricia     $598,976 = ($4,052,201 × .125) + $92,451

---

[6] *Id.*

[7] *Id.* at 853, 852 N.W.2d at 331.

Finally, the court ordered that the buyout distributions be paid to the "Clerk of the District Court of Valley County."

The dissociating partners filed a timely notice of appeal. We denied the remaining partners' motion for summary affirmance. After briefing and oral argument, the appeal was submitted.

## ASSIGNMENTS OF ERROR

In the current appeal, the dissociating partners assign nine errors. In those errors, summarized and condensed, they contest (1) the ultimate amount of their buyout distributions; (2) the district court's authority, under this court's mandates, to require that payment be made to the clerk of the district court; and (3) the exclusion of the evidence offered by the dissociating partners.

## STANDARD OF REVIEW

[1,2] An action for a partnership dissolution and accounting between partners is one in equity and is reviewed de novo on the record.[8] On appeal from an equity action, an appellate court resolves questions of law and fact independently of the trial court's determinations.[9]

## ANALYSIS

*Buyout Distributions.*

In *Robertson II*, we concluded that the "capital gain from the hypothetical sale of land should be distributed to the partners in accordance with [the provision] governing the distribution of 'net profits.'"[10] We remanded the cause, directing the district court to "enter an order which calculates a buyout distribution by adding 12.5 percent of the profit received from a hypothetical sale of the partnership's assets . . . to the value

---

[8] *Robertson II, supra* note 2.

[9] *Id.*

[10] *Id.* at 852, 852 N.W.2d at 330.

of each dissociated partner's capital account."[11] On remand, the district court utilized a net liquidation value of the partnership in the amount of $5,212,015. From that figure, it subtracted the total balance of the partners' capital accounts, resulting in a gain of $4,052,201 from the liquidation.

The dissociating partners contend that the district court should have calculated the buyout distributions beginning with a capital gain from the hypothetical sale of the farmland. From the land's market value, they would compute the capital gain by subtracting the land's original purchase price. They assert that they each should have received 12.5 percent of this capital gain, in addition to the balance of their capital accounts. According to the dissociating partners, such a calculation would result in distributions of $718,685 to Duane, $718,689 to Carolyn, $719,165 to James, and $719,164 to Patricia.

We acknowledge that we made frequent reference to "capital gain" in *Robertson I* and *Robertson II*; however, the dissociating partners' proposed calculation is too simplistic. The dissociating partners overlook the proper framework of a hypothetical liquidation of the partnership. As we stated in *Robertson II*, "[T]he buyout distributions were to be calculated based on the assumption that the partnership assets had been liquidated and the profits from such liquidation were credited to the partners."[12] And in determining the buyout price, § 67-445(2) provides that "profits and losses that result from the liquidation of the partnership assets must be credited and charged to the partners' accounts."

The capital gain from the sale of the land does not represent the "profits and losses" from the liquidation of all of the partnership's assets. As the dissociating partners conceded at oral argument, the record does not reflect what the profit or

---

[11] *Id.* at 853, 852 N.W.2d at 331.

[12] *Id.*

loss would have been on the hypothetical sale of the remaining assets, i.e., the assets other than the land. They attempt to minimize the significance of this concession by stating that the "value" of the personal property was only about $35,000. But the liquidation *value* of the remaining assets tells us nothing regarding the *gain or loss* from their hypothetical sale. Thus, the dissociating partners' arguments are premised only on the gain or loss from part of the assets. Our discussion in *Robertson II* makes it abundantly clear that the hypothetical sale must apply to *all* of the partnership assets. The dissociating partners' calculations fail this basic requirement.

As determined by the district court, the net liquidation value of the partnership was $5,212,015. And none of the parties contested this figure in *Robertson I*.

In order to calculate the "profits and losses," the total balance of the partners' capital accounts in the amount of $1,159,814 must be subtracted from the net liquidation value. The partners' capital accounts are not profits derived from the hypothetical liquidation of the partnership's assets, but represent equity in the partnership and, as the dissociating partners conceded at oral argument, included all of the cumulative profits and losses during the life of the partnership other than those flowing from the hypothetical sale of net partnership assets. Thus, as identified by the district court, the net profits from the liquidation would be $4,052,201. And each of the dissociating partners was entitled to 12.5 percent of this amount, in addition to the balance of his or her capital account.

Based on the above analysis, we conclude that the district court correctly followed our mandate to determine a buyout distribution by adding "12.5 percent of the profit received from a hypothetical sale of the partnership's assets" to the balance of each dissociating partner's capital account. The dissociating partners rely wholly upon the use of pure capital gain in calculating the buyout distributions. But that approach

fails to implement the statutory framework of §§ 67-434(2) and 67-445(2).

Adopting the dissociating partners' argument would lead to an absurd result. Their argument assumes a total partnership "pie," as of the valuation date, of at least $6,173,514 ($5,013,700 capital gain on real estate + $1,159,814 capital accounts). But the "pie" to be divided cannot exceed the total hypothetical liquidation value of all of the partnership's assets less the total amount of the partnership's liabilities. The undisputed evidence shows that this amount was $5,212,015. Their argument simply does not "add up." The assigned errors concerning the buyout distribution have no merit.

*Payment to Clerk of District Court.*

[3] The dissociating partners assert that the district court was without authority, within the parameters of this court's mandate, to order that the buyout distributions be paid to the clerk of the district court. They argue that there was no previous order or mandate that buyout payments be made to the clerk of the district court. But under Neb. Rev. Stat. § 25-2214 (Reissue 2008), the clerk of each court "shall exercise the powers and perform the duties conferred and imposed upon him by . . . the common law" and is "under the direction of his court." And we have previously indicated that the proper place to pay a judgment is the clerk of the court in which the judgment is obtained.[13] This assigned error lacks merit.

*Exclusion of Evidence on Remand.*

[4] Finally, the dissociating partners claim that the district court erred in refusing to receive the exhibits they offered at the hearing on remand following *Robertson II*. Our opinion in *Robertson II* indicated that the record was sufficient to determine the appropriate buyout distributions to be paid to the dissociating partners. And our mandate did not permit

---

[13] See *Myers v. Miller*, 134 Neb. 824, 279 N.W. 778 (1938).

a further evidentiary hearing to be conducted. Where the Nebraska Supreme Court reverses a judgment and remands a cause to the district court for a special purpose, on remand, the district court has no power or jurisdiction to do anything except to proceed in accordance with the mandate as interpreted in the light of the Supreme Court's opinion.[14] Thus, the district court did not err in refusing to receive additional evidence.

## CONCLUSION

We find no error in the district court's calculation of the buyout distribution on remand, or in its order that such distributions be paid to the clerk of the district court. Further, we find no error in the district court's exclusion of evidence. Therefore, we affirm.

AFFIRMED.

WRIGHT, J., not participating.

---

[14] *VanHorn v. Nebraska State Racing Comm.*, 273 Neb. 737, 732 N.W.2d 651 (2007).